All right. Our third case for this morning is Central States Southeast and Southwest Areas Health and Welfare Fund against Shelby Haynes. And we will hear first from Mr. Yaklovich and then from Ms. McMahon. So we'll make sure everybody is present. Thank you, Your Honor. I am here. So am I. Perfect. All right. So, Mr. Yaklovich, you may proceed. Thank you, Judge. And preliminarily, I'd like to make sure that I'm audible in court and counsel. I believe, certainly speaking for the courtroom, everything's fine. Go ahead. Thank you. And secondarily, I would like to reserve about three minutes worth of time for rebuttal. I will attempt to remind you, but you should watch your time, too. I appreciate that. And thank you. Good morning, Judge Wood, Judge Fowler, Judge Easterbrook. And may it please the court, I represent Shelby Haynes and her malpractice lawyer and his law firm in this appeal. Just to begin, I have been practicing law for over 40 years. And the bread and butter of my work during that entire period of time has been contract cases of probably every size and every manner and description. And to be honest, I have never seen quite as interesting a decision as the decision in this case, because this one has a really seismic impact both on established principles of contract formation and also the law governing third party beneficiaries and what it means to be a third party beneficiary. The trial court's decision in this case holds rather clearly that whenever a third party beneficiary of a contract receives a benefit, that third party beneficiary is no longer a third party beneficiary. The decision says that if you receive a benefit, you sign the contract without regard to whether you ever saw the contract or held a pen in your hand. But, you know, Mr. Yakubovich, let me interject here. Benefit funds that are governed by ERISA and actually ordinary insurance policies often, too, define their own terms. Mr. Haynes was the employee. He was, therefore, the primary person under that policy, but he elected dependent care. He designated his daughter, Shelby. This is something that people do every day of the week. You know, they have self plus one or they have self plus family. She's defined as a plan participant. She gets benefits under the plan, and I'm having trouble with the notion that even though she gets all the benefits of the plan, she's somehow not bound by any of the other, let's say, more detrimental criteria, whether it's giving notice of a claim or whether it's a subrogation obligation or whether it's, you know, an age limit or whatever else it may be. I can think of all sorts of fairly common limitations. And so whether you do this by saying she is a defined participant in the plan and if she's going to take the money, she needs to abide by the rest of it, or if you just use third party beneficiary language, I think this is a pretty good fit for a third party beneficiary. But explain to me how you come to this one way street approach. So, yes, Your Honor, and I'm happy to do so. I don't know what everyone's ERISA plan looks like and what the operative procedures are for enrollment. But it is unquestionable that an ERISA plan is a contract. The Supreme Court has said that a couple of times. And it is beyond question that contracts require mutual consent. What happened in this case is really a problem with central states procedures, which everyone seems to be wanting to fix by changing the law rather than changing those procedures. And if I may take a moment to explain, if central states hired me or any other contract lawyer to look at this issue, I would write a very brief memo that contained essentially four points. And that memo would ask them to add about two dozen sentences to all their documents. Wait a minute, Mr. Yakovitch. At the time, at the time, Shelby becomes a covered dependent under the plan. She's only 13 years old. So her signature isn't worth anything anyway. At that point, she's right. She's too young. You know, it could be a two year old for that matter. And so what I'm curious to know is whether you have found any case in the context of welfare benefit plans. I'm not talking about pension plans right now. Welfare benefit plans that has held, as you would like us to hold here, that somebody is entitled to receive coverage for the welfare benefit here, a medical benefit, but who does not need to comply with limitations on that coverage. Is there any such case? Well, your distinction between pension and welfare benefit plans is noted. And my answer is no, there isn't one. This is really a case of first impression. Doesn't that give you pause? I mean, ERISA's been around for a long time at this point. Yeah, but the pause is, where's the contract? There isn't one. There's no written agreement. There's no verbal agreement. And there's no conduct on the part of Shelby Haynes in the record in this case that suggests that she gave any oral assent to central states, let alone any written assent. What about taking the money? I mean, she accepted the $312,000 and some in reimbursement for the cost of these surgeries. And your honor, the trial judge sort of brought that up in her decision more or less on her own. But here is my answer. Did she accept benefits? I mean, there is zero affirmative conduct. She fell ill. She got sick. That's all she did. No, no, no. I don't, I don't, I'm sorry. I can't go there. Did she accept benefits? She had a bill from these medical providers and central states paid the 300, we'll just call it $312,000. So it seems to me, you know, that's a significant benefit for her. If I had a bill for $312,000 and somebody came along and said, oh, you know, I've got it covered. Don't worry about it. That would be a very significant benefit. Your honor, she certainly received the benefit, but the concept of acceptance is somewhat separate from the concept of whether there was a benefit, you know, accepted in the conventional sense of the term I accepted. This is a woman who got wheeled into a hospital, had a surgery performed, got wheeled into another hospital, had a second and subsequently a third surgery, but is getting ill. I mean, suddenly she signed a contract because she got sick. And if I may, your honor, just to go back to if I was going to make this right and avoid this lawsuit altogether, if I was central states, I'd have a clause in my plan that simply said, we don't pay benefits to people who haven't agreed to the terms of the plan. And when you become a legal adult, you obviously acquire the power to enter into contracts. I would have the IT people at central states create an algorithm that shortly before your 18th birthday, you got a letter from central states and a consent form, and if you didn't sign and return it, then the first time some healthcare provider contacts central states, central states says, yeah, she's covered, but not until she consents. And so the patient advocate at the hospital gets a notification to that effect along with a consent form. I mean, where we are is we're using the wrong tools to fix the problem. The problem is with the plan, and the fix here is a rather massive alteration of contract law. But I have to say, Mr. Yakovitch, you seem to be saying, I don't mean to be too unfair about this, but you seem to be saying that there isn't enough paperwork already in the administration of healthcare plans, and that's a shocking proposition to anybody who's had to work their way through any kind of medical care, hospitalization, or comparable outpatient care. When somebody is listed as a dependent on their relatives, could be a spouse, could be a parent plan, then people rely on that. It was a big deal in the Affordable Care Act that parents could keep children on until the age of 26, and there wasn't this extra paperwork burden that you seem to think is essential to legality. Well, Your Honor, I'm not talking really about extra paperwork. I'm talking about a sentence or two in the plan document, and an algorithm that notifies people around the time of their 18th birthday, we're not going to pay you about this unless you sign a consent form. That's really all that is required here, but it didn't get done. Okay, I'll accept that it didn't get done, that's for sure. And just for your information, you are at the three-minute mark. Oh, and if I am, Your Honor, I'd like to reserve. Thank you. You're welcome.  Yes. May it please the Court. I am Rebecca McMahon, and I represent the plaintiffs' appellees in this matter. Now, the district court held that the subrogation provisions in the funds plan document created an equitable lien-by agreement between the parties, and the appellees request that this decision be affirmed. All of the parties agree that the controlling law is a series of Supreme Court cases regarding subrogation and reimbursement rights, namely Saraboff, McCutcheon, and Montanile. In each of these cases, the Supreme Court found that the applicable plan language created an equitable lien-by agreement, which satisfies the requirements of Section 502A3 of ERISA. And as the plan at issue here contains similar language, the analysis should end here. However, the appellants are arguing that no equitable lien-by agreement exists in this case because no appellant ever agreed to the terms of the plan. Now, this argument is made despite the fact that, as the Court pointed out, Shelby took the benefits of the plan when she needed them most. Appellants make much of the fact that Shelby's conduct was passive in this case and that all she did was become ill. But I wanted to start by highlighting a few of the undisputed facts that support Shelby's agreement to the plan. As the Court pointed out, she accepted over $300,000 worth of benefits, and her father did enroll her in the plan. I also want to point out that at the time she went to the hospital, she represented to the providers, the doctors, that she was covered by the plan. She either did this by giving them the fund's contact information, or more likely she probably showed them a copy of her insurance card. Otherwise, the doctors would have had no way to know who to bill. So she made the affirmative representation at that time that she was covered by the plan. After she received her treatment, she received EOBs showing how much the fund had paid, and she never called the fund and questioned her coverage under the plan. And then after she hired her counsel for her underlying medical malpractice case, she did receive notice of liens from fund's counsel periodically, every couple months. And these notices of lien contained a summation of the amounts that had been paid on her behalf. They identified the sections of the plan regarding subrogation and reimbursement. And at no time during the settlement, the negotiation phase, it was a couple of years long, at no time during this period did she ever protest and say that she wasn't covered by the plan. So it was only after the settlement fund was created and Shelby's obligation to reimburse the fund was triggered that she no longer wanted to be a party to the plan. Now I want to talk about a few of the implications of appellants' suggestion that the fund modify its plan documents to include a requirement that an agreement be signed. I think that these implications are significant. And the failure of this suggestion is highlighted by the current health crisis that our country is in today. Obviously, in order to enforce compliance with this requirement, the fund would have to suspend coverage until a signed agreement is received. And this is significant. It would lead to delayed treatment for many, many people, particularly in times of emergency or when prescriptions are needed on an immediate basis. Oftentimes, participants aren't too concerned with complying with the plan until they need something from the plan. So this would cause a rush to get agreements signed and coverage turned back on and would delay treatment. It would also delay payment to providers, and they may have to submit claims more than once in order to get the money that they are entitled to. So it's not just as easy as putting an algorithm into a computer and all of a sudden the problems are fixed. And RISA doesn't require there to be an actual signed plan in order for the participants and the beneficiaries to be bound by it. So the appellees here urge this court to reject creating such a requirement. A couple of other things I want to touch on. The appellants have cited a series of cases litigated by the fund in support of their position regarding the coordination of benefits with other insurers. However, these cases aren't instructive here. In these COB cases, several courts of appeal held that the fund was not seeking appropriate equitable relief under Section 502A3 of RISA and its reimbursement actions against other entities that insured its beneficiaries. In these cases, the courts drew a clear distinction between these other insurers and the fund's own beneficiaries, who have been put on notice of their reimbursement obligations under the plan. The courts also noted that the other insurers had no mutual promise with the fund. Now, obviously, there were mutual promises in this case. Shelby expected her medical benefits to be paid. That's why she provided her insurance card or the fund's information to her provider. She expected those expenses to be paid by the fund. And in exchange for that, the fund expected Shelby to live up to the other obligations that are under the plan. So Shelby can't be compared to the other insurers. Ms. McMahon, could I ask you to maybe take a bit of a turn in your argument? One of the things Mr. Yaklovich has raised is that the first copy of the summary plan description that the Haynes' received did not clearly say anything about common fund reimbursement. It was only this later copy that was clear about that. And so they're pressing as a backup argument, as I understand it, that the $1,500,000 in the tort settlement be regarded as a common fund, and they contributed to that. So that needs to be taken into account. Sure, absolutely. I think there's a bit of confusion about what was produced and when it was produced. Just to be clear, the way that things have been titled, the second summary plan description, as it's been named by appellants, was provided to Shelby's father a couple months before her surgery. Periodically, obviously, ERISA requires a plan to submit, to send out plan documents to its participants, you know, according to a timetable. And that's when he received the second CBA. Now, during this litigation ---- Is there a readily accessible link that somebody who wants to read through it could find it? Absolutely, yes. So all plan documents are available online, and any participant can go and look at it, any beneficiary can go look at it, and actually anyone can go look at it. They're not, you know, it's not hidden in any way. Also, I would like to point out that participants can request a hard copy of any plan documents, and by statute the fund is required to provide those within a certain time period or else be subject to daily fines. So there are many ways that these documents are all available to view. And regardless of what the SBD states in this case, the plan specifically states that the fund's subrogation rights are not in any way subordinate to or affected by any common fund principle or factor. So the plan clearly addresses the issue of the common fund doctrine, and it leaves no space for the common fund doctrine to operate. Well, eventually she gets a version of the plan that says that. I think her problem is that there is a version that she's given of the summary plan description that isn't as clear as the way you just stated it. Sure, sure, yes. You know, the SBDs are obviously a summarization of the plan, and we believe that. The what? I'm sorry. The what is a version of the plan? It's just a summarization of the plan. And I can say that any SBD that's at issue in this case stated that the fund. No, I thought you said the SPD. The summary plan description. Yes, if you would use English words, that would help us generalists. Sure. Sorry, I apologize. The summary plan description at issue in this case, anyone that you would look at, states that the fund has subrogation rights to 100% reimbursement. You know, that alone warns that there should be no common fund doctrine would operate, no reduction should be allowed. And there was a Scrivener's error in one of them, the one that was provided at the beginning of this litigation. The information about the, it stated that the funds reimbursement is not reduced by any attorney's fees or other costs incurred in obtaining your settlement was inadvertently moved down one heading. But the one that the. You know, the fact is, you say that, and I'm quite resistant to the idea that somebody's summary plan description to make sure that you didn't put a sentence in the workers' compensation section that belonged in some other section. It seems to me it's on you to put it in the right section. Now, maybe it's enough to say 100% reimbursement and understand that that excludes all sorts of things, including perhaps the common fund doctrine. But I'm not really taken with the idea that, you know, if you put it under some completely unrelated part of the document, people are supposed to realize that that was the wrong place. Sure. We understand that that was an error that occurred in putting the document together. We don't expect people to scour the entire document. But I do believe, and it is our position, that the language that says the fund has subrogation rates to 100% reimbursement is enough. Now, this court in Merz v. Marriott recognized that a plan and a summary plan description, one can clarify the other. And I think that's exactly what's happening in this case. The summary plan description is supposed to contain less legalese, so it doesn't necessarily have to contain the phrase common fund doctrine. But as the district court pointed out, the plan and the summary plan description are in accord. They say the same thing. They mean the same thing. Counsel, I'm just puzzled why you're not just citing Cigna Corporation against Amara and stopping. I understand that case to hold that if there's a conflict between the summary plan description and the plan, the plan wins. And it's all that simple. Yes, I agree. I absolutely agree. And that case also states that the summary plan description provides communications about the plan, but it doesn't constitute the terms of the plan. And that's because the plan is at the center of ERISA. So I think the analysis does end there. I think that we look at the plan that clearly disavows the common fund doctrine and leaving no space for it to operate. And just as the court had said, the district court had said, the documents are all in accord. A couple of other things about the common fund doctrine that I wanted to raise is that this court has held that a summary plan description will provide a basis for estoppel only if the participant relied upon its language. Now, by appellant's own admission, they could not have relied upon the summary plan description language during the settlement of Shelby's underlying case. They have stated in the lower court in here that they never saw a copy of any SPD summary plan description until September of 2017. Now, Shelby settled her medical malpractice case in July of 2017. So there's no way for – there would have been no way for Shelby or her attorneys to, you know, read this language and determine there's some deficiency and, you know, therefore the common fund doctrine must operate in this case and settle her case any differently. The other thing I want to point out is that the summary plan description warns that information provided in the summary plan description is subject to the terms of the plan, you know, directing the reader to go look at another document that, you know, obviously clearly disavows the common fund doctrine. And this court has recognized that estoppel is not available when participants receive such a warning. So appellant's estoppel argument must fail and the clear language of the plan disavowing the common fund doctrine should control in this case. And the district court's finding that the common fund doctrine does not apply in this case should be upheld. So unless there are any further questions, I respectfully request that this court affirm the decisions below. Thank you. All right. Thank you, Ms. McMahon. Anything further, Mr. Yakovlevich? Yes. Thank you. Equitable means by agreement are based on agreements. The Supreme Court in Sarabov and McCutcheon and Mott and Neal said that repeatedly. There's no agreement here. And I don't see any latitude to substitute the fact that central states did what it did in the place instead of an agreement. There simply is no agreement in this case. And with regard to one factual aspect of this, I heard counsel say Shelby Haynes must have produced her health ID card. This is a woman who is seriously ill. That factoid is simply not part of the record in this case. No one tried to develop that fact. I'm hearing it for the first time on oral argument. But, you know, Mr. Yakovlevich, there's clearly the health care providers, the hospital, found out that there was an, I'm just going to call it an insurance plan, a welfare benefit plan to which it could send the bill because it did send the bill. It didn't just send one to every entity in the United States, I assume. So I agree with you. We don't know from this record whether she or, you know, a family member or someone showed an insurance card or whether information was orally given. But, boy, it's pretty standard procedure for medical providers to find out who's going to pay before they do too much. Your Honor, theories and facts. And the guiding principle in these ERISA cases is that one party to an ERISA contract, the beneficiary of that contract is the favored party. This court has stated that a couple of times. So if we're going to fill in the blanks, I'm not sure that it's appropriate to fill the blanks in with the fund's version of what the facts might be. But I've been encountering that in this case from day one. Equitable means by agreement, as the name of that claim suggests, have to be based on agreements in order for that cause of action to have any vitality. Okay. I think we're going to have to leave it there, Mr. Yakovitch. You have certainly made that point, and you do in your briefs. So we thank you for your argument. We also thank Ms. McMahan, and we will take the case under advisement.